# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHARON DIXON,                           :
    Plaintiff,                        :
                                      :          CIVIL ACTION NO.
v.                                      :          3:14-cv-01468 (VAB)
                                      :
METROPOLITAN DISTRICT COMMISSION,       :
    Defendant.                        :

## RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sharon Dixon ("Plaintiff") filed this lawsuit against her former employer, Metropolitan District Commission ("Defendant," or "MDC"). Compl., ECF No. 1. Ms. Dixon claims that MDC retaliated against her for making protected discrimination complaints, in violation of Title VII of the Civil Rights Act of 1964. Sec. Am. Compl., ECF No. 46.

MDC has moved for summary judgment and seeks dismissal of Ms. Dixon's sole claim of retaliation under Title VII. Mot. for Summ. J., ECF No. 61. As explained in further detail below, MDC's [61] Motion for Summary Judgment is **GRANTED**.

## I.      STATEMENT OF FACTS[1]

Sharon Dixon is a former employee of MDC, a non-profit municipal corporation chartered to provide water and wastewater treatment services to several towns and municipal entities in Connecticut. L.R. 56(a)(1) ¶ 16. Ms. Dixon began working for MDC as a Senior Clerk in the Human Resources ("HR") Department in July 1987. *Id.* at ¶ 1. She continued working within the HR Department until 2007, when she transferred to work in the Diversity Department, and she remained employed by MDC until her position was terminated as part of a reduction in force ("RIF") in late 2011. *Id.* at ¶¶ 1, 26.

---

[1] The following facts are undisputed unless indicated otherwise.

## A. 2006 Discrimination Complaints and Settlement

In September 2005, MDC posted a job opening for an Executive Administrative Assistant position with MDC's Chief Executive Officer ("CEO"), Charles Sheehan. L.R. 56(a)(2) p. 17. Ms. Dixon applied for the position that same month and she was eventually selected as one of three finalists. *Id.* Ms. Dixon, however, was ultimately not selected for the position and she believed race discrimination played a role in the selection process, as she considered the individual hired to be less qualified than her. *Id.* at 18.

On January 12, 2006, Ms. Dixon filed an internal complaint with Rick Gomez, who was serving as MDC's Affirmative Action Officer at the time, alleging race discrimination. *Id.*; L.R. 56(a)(1) ¶¶ 2-3; 2006 Internal Compl., Pl. Ex. 38, ECF No. 69-38.[2] Mr. Gomez initiated an investigation into Ms. Dixon's claims, and he ultimately determined that MDC's rejection of Ms. Dixon for the position in question did not have to do with her race. Gomez Mem. to CEO, Pl. Ex. 39, ECF No. 69-39; Mar. 2006 Gomez. Ltr., Shea Aff. Ex. B, ECF No. 64-2.

On June 22, 2006, Ms. Dixon filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC") based on the same allegations raised in her internal complaint. L.R. 56(a)(1) ¶ 4; 2006 CHRO Compl., Pl. Ex. 4, ECF No. 69-4. Ms. Dixon then attended a conference with representatives of MDC to discuss her administrative complaint. L.R. 56(a)(2) p. 19. During that conference, MDC agreed to transfer Ms. Dixon to a new position in exchange for the withdrawal of her complaint. *Id.*; L.R. 56(a)(1) ¶¶ 5-6. Ms. Dixon agreed, and in 2007,

---

[2] Ms. Dixon amended her complaint on February 15, 2006 to include additional allegations that one of the decision-makers improperly altered the candidates' files after the successful candidate had already been hired. L.R. 56(a)(2) p. 18.

she assumed the new role of Community Affairs Assistant with MDC's Diversity Department, which came with a higher salary and a higher status within the company. *Id.*

### B. Verbal Reprimands

Ms. Dixon alleges that, in June 2011, she received a verbal reprimand from her supervisor for misusing her personal break time. L.R. 56(a)(2) p. 22. According to Ms. Dixon, MDC offers its employees two fifteen-minute breaks during the day, as well as a lunch break. Dixon Aff. ¶ 29, Pl. Opp. Ex. 1, ECF No. 69-1. Ms. Dixon claims that she used one of her fifteen-minute breaks to make a personal phone call on one of the balconies. *Id.* At the conclusion of her call, which she alleges did not last more than fifteen minutes, she saw Bart Halloran, MDC Counsel, watching her from the other side of the glass door to the balcony. *Id.* One or two days later, George Scurlock, Ms. Dixon's supervisor within the Diversity Department, called her into his office and informed her that she was observed taking a personal phone call on the balcony for thirty to forty-five minutes. *Id.* at ¶ 30. Ms. Dixon protested, insisting that she was not on the phone for more than fifteen minutes. *Id.* She states that, after her meeting with Mr. Scurlock, she felt "upset" and as if she was being "sought out." *Id.* at ¶ 31. She was not formally reprimanded, nor was any formal discipline imposed. *Id.*

The following month, in July 2011, she alleges that Chris Stone, another one of MDC's attorneys, reprimanded her for not responding to an e-mail from Mr. Halloran, District Counsel for MDC. *Id.* According to Ms. Dixon, Mr. Halloran had sent her an e-mail asking her to complete certain tasks for a Clean Water Project, and she completed the requested tasks. *Id.* at ¶ 33. Ms. Dixon states that Mr. Halloran's e-mail did not request or require a response. *Id.* at ¶ 34. Nevertheless, following this incident, Ms. Dixon had tasks she had been performing for the Clean Water Project reassigned to another employee. *Id.*

Ms. Dixon claims that both of these incidents were in retaliation for filing complaints in 2006. *Id.*

### C. Reduction in Force

Ms. Dixon worked for MDC's Diversity Department from her transfer in 2007 until October 2011, when her position was selected for termination in connection with a company-wide reduction in force. *Id.* at ¶¶ 1, 26.

#### 1. Loss of Contract

For twenty-seven years, the Connecticut Resources Recovery Authority ("CRRA") (the "Mid-Conn Contract") contracted with MDC to operate and maintain the Mid-Conn Facility, a large trash facility located in Hartford, Connecticut. L.R. 56(a)(1) ¶ 7; L.R. 56(a)(2) pp. 3, 26. The contract expired in 2011. L.R. 56(a)(1) ¶¶ 8-12. In late 2010, CRRA opened up a competitive bidding process to determine who would operate the Mid-Conn Contract for the coming term. *Id.* MDC bid to provide services, but CRRA chose another company. *Id.*

Indirect revenue from the Mid-Conn Contract totaled $2.1 million, and the end of this contract resulted in significant financial loss to MDC. *Id.* MDC challenged CRRA's competitive bidding process through litigation in Connecticut Superior Court; the court, however, rejected MDC's claims in August 2011 and this effort to prevent the termination of the Mid-Conn Contract failed. *Id.*

#### 2. Cost-Saving Committee and Methodology

Beginning in September 2011, individuals involved in the management of MDC began to discuss ways of responding to the financial losses associated with the loss of the Mid-Conn Contract. *Id.* ¶ 13. They created a committee to explore how to implement the required cost savings. *Id.* According to Ms. Dixon, MDC selected six individuals to serve on this committee:

Robert Zaik; Deputy CEO Scott Jellison; Deputy CEO and Chief Financial Officer ("CFO") John Zinzarella; Interim HR Director Erin Ryan; and MDC counsel Bart Halloran and Christopher Stone.  L.R. 56(a)(2) p. 23.  The committee determined that, in order to accomplish the desired cost savings, MDC would need to conduct a reduction in force.[3]  L.R. 56(a)(1) ¶ 16. Accordingly, the committee established a multi-step methodology to determine which positions would be eliminated.  L.R. 56(a)(1) ¶¶ 21-24.  The committee's first meeting was in September of 2011.  L.R. 56(a)(2) p. 24.

MDC describes the selection of positions for layoff as essentially a two-step process. During the first step, MDC identified positions that were either directly or indirectly involved with the Mid-Conn Contract.  *Id.* at ¶¶ 22-24.  According to MDC, only three positions were identified in this category by the committee.  *Id.*  During the second step, MDC identified positions that could be eliminated without impacting MDC's core functions.  *Id.*  According to MDC, fourteen positions were identified in this category, including Ms. Dixon's position.  *Id.* MDC insists that the committee was tasked with identifying positions for elimination, not individual people.[4]  *Id.* at ¶ 20.

Ms. Dixon challenges some aspects of MDC's description of this process.  According to Ms. Dixon, the process was a four-step process, not two, through which MDC would identify (1) "[p]ositions assigned directly" to the Mid-Conn Contract; (2) "[p]ositions that provide direct support" to the contract; (3) "[p]ositions that provide back-office administrative supports" to the contract; and (4) "[p]ositions whose elimination will not affect the core business needs" of MDC.

---

[3] Ms. Dixon claims that it is unclear whether Mr. Sheehan instructed the committee to conduct a reduction in force during their first meeting or whether he generally charged them with identifying $2.1 million in cost savings.  L.R. 56(a)(2) p. 25.

[4] Ms. Dixon claims that MDC did not follow this policy in practice, citing documentation from committee members that listed individuals by name in connection with the reduction in force.  L.R. 56(a)(2) pp. 35-36.

L.R. 56(a)(2) at p. 26.  Ms. Dixon acknowledges that her position would have been selected for termination as part of the fourth and final category.  *Id.* at 33.

Ms. Dixon, however, claims that her position was selected for termination even before the committee began the first step of this selection process.  *Id.* at 34 ("Plaintiff was pre-selected for layoff").  She alleges that, on Labor Day weekend in 2011 – before the committee's first meeting – Mr. Halloran informed Mr. Scurlock, Director of Diversity and Ms. Dixon's supervisor, that MDC would be laying off both Ms. Dixon and Rick Gomez and instructed Mr. Scurlock to keep this information confidential.  *Id.* at 34.  MDC, on the other hand, insists that Ms. Dixon's position was selected for termination later, as a result of the committee's multi-step methodology.  L.R. 56(a)(1) ¶¶ 36-37.

### 3.  Termination

On October 6, 2011, the District Board of Commissioners ("the Board"), which governs MDC, adopted a resolution directing the management of MDC to "eliminate such positions within the District organizational structure as are reasonably and functionally necessary to address the budgetary and financial consequences resulting from the expiration of the District contract with Connecticut Resources Recovery Authority…." *Id.* at ¶ 19.  The following day, on October 7, 2011, Ms. Dixon was notified that her position was being eliminated.  *Id.* at ¶ 7.

Erin Ryan, one of the committee members, was primarily responsible for assessing Ms. Dixon's position and recommending her position for elimination.  *Id.* at ¶ 37.  Ms. Ryan joined MDC in January 2011, and she assumed the position of Interim HR Director in July 2011.  *Id.* at ¶¶ 32-34.  According to Ms. Dixon, Ms. Ryan was not very familiar with either the nature of Ms. Dixon's position or the work of the Diversity Department when she made the decision.  L.R. 56(a)(2) pp. 30, 33.  Ms. Dixon also insists that Ms. Ryan and all of the other committee

members were aware of Ms. Dixon's prior discrimination complaints at the time the decision was made to eliminate her position. *Id.* at 43.

A total of twenty jobs were eliminated through this reduction in force, including Ms. Dixon's position, three of which were union positions directly related to the Mid-Conn Contract and another three of which were non-union positions with direct ties to the Mid-Conn Contract. *Id.* at 31. The remaining fourteen positions were selected based on the logic that their elimination would not affect MDC's core business needs. *Id.* at 32. Ms. Dixon claims that the Diversity Department suffered disproportionately from the reduction in force, as the entire department went from five individuals to three. *Id.* at 8.

Ms. Dixon also claims that, following her termination, several of her job duties were reassigned to a consultant named Lillian Ruiz. *Id.* at 48. According to Ms. Dixon, Ms. Ruiz, who was hired before Ms. Dixon left her position, was given responsibility for reviewing MDC's "payroll and minority contractor participation compliance program," which had previously been Ms. Dixon's responsibility. *Id.* at 49.

Ms. Dixon further claims that individuals who had previously made discrimination complaints against MDC were also disproportionately affected by the reduction in force. *Id.* at 40-47. Ms. Dixon claims that there were six former employees identified by MDC who had filed discrimination complaints against the company: Ms. Dixon, Donna Szestakow, Deborah Smith, Lebert Thomas, Rick Gomez, and Kathy Drake. *Id.* Of those positions, five were identified for elimination as part of the reduction in force in October 2011, and the remaining individual – Lebert Thomas – was terminated for other reasons earlier that same year, in January 2011. *Id.*

Ms. Dixon refers to four additional individuals who were not terminated despite having made complaints about discrimination during their employment with MDC – Greg Robinson,

Jennifer Ottalgana, Constantin Banciulescu, and Russ Mannilla. *Id.* at 47. She claims, however, that three of these individuals, Ms. Ottalgana, Mr. Banciulescu, and Mr. Mannilla, never filed formal complaints with the CHRO and Mr. Robinson filed his discrimination complaint more than fifteen years before the reduction in force. *Id.* at 47. Ms. Dixon does not claim that MDC conducted any analysis regarding the protected activity of individuals whose positions were selected for elimination. *Id.* at 46 ("The District did not conduct any sort of impact analysis regarding the prior protected activity of the employees selected for job elimination.").

## II.    STANDARD OF REVIEW

The Court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has carried that initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If no reasonable jury could find in favor of the opposing party because "the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Id.* Disputes concerning immaterial facts do not prevent summary judgment. *See id.*; *Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("[S]ummary judgment cannot be avoided

by immaterial factual disputes."). When ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).

## III. DISCUSSION

MDC now moves for summary judgment on Ms. Dixon's sole claim of retaliation, arguing that the undisputed facts do not support a causal nexus between Ms. Dixon's prior complaints of discrimination and her termination in October 2011. Def. Mem. in Supp., ECF No. 62. Ms. Dixon opposes MDC's motion. Pl. Mem. in Opp., ECF No. 68. While Ms. Dixon does not dispute that her position was eliminated in connection with a legitimate reduction in force, she nonetheless argues that her discrimination complaints in 2006 were a "but-for cause" of her selection for termination as part of this reduction in force, violating the anti-retaliation provisions of Title VII. She also argues that the verbal reprimands she received in advance of the reduction of force constituted separate acts of retaliation in violation of Title VII. The Court disagrees and grants summary judgment on Ms. Dixon's only claim.

"To establish a prima facie case of unlawful retaliation under Title VII, 'an employee must show that (1) [s]he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24–25 (2d Cir. 2014) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory existed for its action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)). "If the employer

demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* (internal quotations and marks omitted).

MDC claims that Ms. Dixon cannot establish a *prima facie* case of retaliation under Title VII, and that, even if she could, there is no genuine dispute of material fact that MDC had a legitimate, non-discriminatory reason for its decision. The parties do not dispute that Ms. Dixon engaged in protected activity by filing internal and administrative discrimination complaints against MDC in 2006, nor do they dispute that her termination in 2011 constituted an adverse employment action on the part of MDC; they disagree, however, regarding whether the relevant decision-makers were aware of Ms. Dixon's protected activity and whether there was any causal connection between Ms. Dixon's protected activity and her termination. The parties also disagree regarding whether the alleged reprimands in June and July of 2011 constituted materially adverse actions for purposes of a retaliation claim.

### A. Termination

#### 1. Awareness of Protected Activity

According to MDC, Erin Ryan was the relevant decision-maker in selecting Ms. Dixon's position for termination, and she was not aware of Ms. Dixon's prior discrimination complaint at the time the decision was made. Ms. Dixon insists, however, that other decision-makers played a role in her selection for layoff, and that all decision-makers were aware of her complaints at the time the decision was made to eliminate her position.

"[F]or purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013); *see also Papelino v. Albany*

*Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) ("Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice."); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 147 (2d Cir. 2010) (rejecting jury instruction that required direct notice on the part of decision makers in Title VII retaliation claim).

MDC does not argue that the company as a whole lacked knowledge of Ms. Dixon's 2006 discrimination complaints. Rather, it argues that Erin Ryan, the purported decision-maker regarding the selection of Ms. Dixon's position for elimination as part of the reduction in force, did not know of Ms. Dixon's complaints at the time of the decision. Under the governing law, this argument is not enough to establish entitlement to summary judgment as to this element. *See Celotex Corp.,* 477 U.S. at 331 ("The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment.")

The undisputed facts show that MDC had general corporate knowledge of Ms. Dixon's complaints. Ms. Dixon made both an internal complaint and an administrative complaint of discrimination against MDC in 2006. *See* 2006 Internal Compl., Pl. Ex. 38, ECF No. 69-38; Gomez Mem. to CEO, Pl. Ex. 39, ECF No. 69-39; 2006 CHRO Compl., Pl. Ex. 4, ECF No. 69-4. The complaints were related to Ms. Dixon's unsuccessful application to a position that worked directly with MDC's CEO and her transfer to the Diversity Department was a direct result of those discrimination complaints. *Id.*; Settlement Agreement, Pl. Ex. 40, ECF No. 69-40. Drawing all inferences in favor of the non-moving party, as is required at this stage, *see Dalberth*, 766 F.3d at 182, Ms. Dixon has established sufficient knowledge on the part of MDC to survive summary judgment with respect to this element of her Title VII retaliation claim.

## 2. Causal Link between Protected Activity and Termination

MDC focuses most of its arguments on whether there is a genuine dispute of material fact regarding a causal link between Ms. Dixon's discrimination complaints in 2006 and her termination from the company five years later. According to MDC, the temporal proximity between the two events is insufficient to support causation in this case for purposes of a *prima facie* case, and the alleged inconsistencies regarding the timing of Ms. Dixon's selection for termination cannot create a genuine dispute of material fact with respect to this element.

"The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Zann Kwan*, 737 F.3d at 845-46 ("a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 845-46.

Ms. Dixon asserts that her 2006 discrimination complaints were a "but-for" cause of her termination in October 2011. In support of this argument, she offers statistical evidence suggesting that most of the employees who had previously filed discrimination complaints against MDC were terminated in connection with the reduction in force in 2011. She also offers deposition testimony suggesting that she was identified for layoff in early September, weeks before the committee formally began making its selections for termination.

### a. Temporal Proximity

A plaintiff's "presentation of a temporal connection" may be "enough, in and of itself…

to permit a reasonable jury to find causation." *Summa*, 708 F.3d at 127. While temporal

proximity alone is not sufficient for the plaintiff to carry her ultimate burden in a retaliation case,

*see Zann Kwan,* 737 F.3d at 847 ("Temporal proximity alone is not sufficient to defeat summary

judgment at the pretext stage."), the case law in this Circuit suggests that temporal proximity, if

sufficiently close, may be enough to satisfy the causation element for purposes of a *prima facie*

case. *See Preuss v. Kolmar Labs., Inc*., 970 F. Supp. 2d 171, 198 (S.D.N.Y. 2013) ("In the

absence of direct evidence, the causal connection 'can be established indirectly by showing that

the protected activity was closely followed in time by the adverse action.'") (quoting *Manoharan*

*v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).

In cases where temporal proximity has been found to support a finding of causation for

purposes of a *prima facie* retaliation case, the gap between the protected activity and the adverse

action is typically brief. *See, e.g. Zann Kwan*, 737 F.3d at 845 (2d Cir. 2013) ("The three-week

period from Kwan's complaint to her termination is sufficiently short to make a prima facie

showing of causation indirectly through temporal proximity"); *Gorzynski v. JetBlue Airways*

*Corp*., 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining,

for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is

too attenuated to establish causation, we have previously held that five months is not too long to

find the causal relationship."); *cf. Clark Cty. Sch. Dist. V. Breeden*, 532 U.S. 268, 273-74 (2001)

("The cases that accept mere temporal proximity between an employer's knowledge of protected

activity and an adverse employment action as sufficient evidence of causality to establish a prima

facie case uniformly hold that the temporal proximity must be 'very close'… Action taken (as here) 20 months later suggests, by itself, no causality at all.").

MDC correctly argues that temporal proximity cannot support an inference of causation for a *prima facie* case here. Ms. Dixon's protected activity took place in 2006, and her discrimination complaints were resolved by settlement in 2007. MDC notified Ms. Dixon of her termination on October 7, 2011, over four years after her underlying discrimination complaint had already been resolved. This four-year period falls far beyond the "very close" window recognized as supporting an inference of causation, *see id.*; thus, evidence, other than temporal proximity, is needed in order for Ms. Dixon to establish a *prima facie* retaliation case for purposes of surviving summary judgment.

### b. Termination of Similarly Situated Employees

Ms. Dixon's inability to demonstrate temporal proximity, however, is not necessarily fatal to her *prima facie* case of retaliation. The Second Circuit "has consistently held that proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Ms. Dixon has not offered any direct evidence that her 2006 discrimination complaints were a "but-for" cause of her termination. Rather, she has specifically alleged that MDC waited for an "opportune time" to terminate employees who filed discrimination complaints. In support of this claim, she offers circumstantial evidence showing that the majority of MDC employees who had previously filed

formal discrimination complaints against the company were terminated as part of the reduction in force in October 2011.

This Court evaluated this same argument when deciding summary judgment in a separate lawsuit brought by Ms. Dixon's former co-worker, Rick Gomez. *See Gomez v. Metropolitan Dist.*, 10 F. Supp. 3d 224 (D. Conn 2014). Like Ms. Dixon, Mr. Gomez had previously filed a discrimination complaint against MDC during the course of his employment, and he was also laid off during the 2011 reduction in force. *Id.* In connection with his Title VII retaliation claims, Mr. Gomez presented similar statistical evidence regarding the termination in 2011 of other employees who had filed complaints against the company. *Id.*

In *Gomez*, the Court (Arterton, J.) assessed evidence suggesting that "all six of the non-union employees who had complained of discrimination were terminated." *Gomez*, 10 F. Supp. 3d at 239-40 (explaining that plaintiff presented "admittedly small-sample statistical evidence showing that five out of the fourteen (36%) non-union employees included in the RIF had previously filed a complaint or otherwise opposed discrimination" and that "the only other exempt and excluded employee who had previously complained of discrimination was terminated in January 2011.") The Court concluded that this evidence would not be enough to carry the plaintiff's burden standing alone, but it was enough to defeat summary judgment in combination with other evidence presented. *Id.* at 241 ("The Court concludes that the statistical evidence proffered by Plaintiff is relevant circumstantial evidence that could support the inference that Defendant used the RIF as an occasion to 'clean house' of all employees who had previously engaged in protected activity… such statistical evidence is not sufficient on its own to support an inference of retaliatory motive, but with Plaintiff's other evidence – inconsistencies in Defendant's explanations about the reduction of Gomez's responsibilities and the process used to

select him for elimination – Plaintiff has produced minimally sufficient evidence to support an inference of retaliatory motive.").

There are differences between the evidence currently before the Court and the evidence considered in *Gomez*. Ms. Dixon has presented the same information provided by Mr. Gomez regarding those six individuals who were terminated in 2011 after filing complaints of discrimination. Unlike in Mr. Gomez's case, however, there is evidence that four additional individuals made discrimination complaints but were not terminated. MDC claims that this additional information sufficiently distinguishes Ms. Dixon's case from Mr. Gomez's, noting that "the *Gomez* Court was unaware at the time it rendered its decision on the Motion for Summary Judgment of the fact that there were four employees who had previously filed complaints who were not terminated in the reduction in force." Def. Reply Br. at 7, ECF No. 74. Nevertheless, Ms. Dixon has argued that the discrimination complaints made by these four individuals were either significantly more remote in time or less extensive than the complaints filed by those who were terminated. L.R. 56(a)(2) at p. 47.

In this Circuit, "[t]he burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the *prima facie* stage has been characterized as 'minimal' and 'de minimis.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (quoting *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005)) (internal quotations and marks omitted). "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether preferred admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.* (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.3d 54, 58 (2d Cir. 1987)). While, for reasons discussed below, Ms. Dixon's retaliation claim ultimately must be

dismissed, the Court assumes that she has satisfied her burden at the *prima facie* stage of summary judgment, drawing all inferences in her favor.

Once a *prima facie* case has been established, the burden of production then shifts to the defendant to "demonstrate that a legitimate, nondiscriminatory existed for its action." *Summa*, 708 F.3d at 125. If MDC is able to demonstrate a non-discriminatory reason, summary judgment is appropriate if Ms. Dixon is unable to provide any evidence that "the employer's action was, in fact, motivated by discriminatory retaliation." *Id*.

### c. Evidence of "Pre-Selection"

MDC contends that it had a non-discriminatory reason for terminating Ms. Dixon; namely, the loss of the Mid-Conn Contract and the resulting reduction in force. Courts have consistently found that a company-wide reduction in force is a legitimate, non-discriminatory reason for terminating someone's employment. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) ("We have previously held that a RIF constitutes a legitimate, nondiscriminatory reason for termination of employment."); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1221 (2d Cir. 1994) ("The reason given by Prudential for termination was a reduction-in-force… Economic decisions of that sort are, of course, outside a court's purview."); *see also Skiff v. Colchester Bd. of Educ.*, 514 F. Supp. 2d 284, 298 (D. Conn. 2007)*, aff'd*, 316 Fed. Appx. 83 (2d Cir. 2009) ("[T]he Court should not second-guess the defendant's business decisions, however unwise, so long as not made for discriminatory reason."). Thus, MDC has sufficiently articulated a legitimate, non-discriminatory reason for its decision and the burden shifts back to Ms. Dixon to establish that this reason was a pretext for retaliation. *See Zann Kwan*, 737 F.3d at 845 ("[A]fter the defendant has articulated a non-

retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the prima facie case drops from the picture.").

Ms. Dixon does not challenge the legitimacy of MDC's reduction in force as a whole, nor does she present any evidence that her position should not have been identified for elimination based on MDC's internal analysis. *See* L.R. 56(a)(2) at p. 26 (explaining that the fourth step of MDC's analysis was to identify positions "whose elimination will not affect [MDC's] core business needs"). Instead, she claims that her prior discrimination complaint against the company impermissibly played a role in the company's decision to terminate her position, and she generally asserts that her position would not have been eliminated were it not for her prior discrimination complaint. In support of this assertion, she attempts to highlight various inconsistencies in the methodology identified by MDC for conducting this reduction in force, pointing to deposition testimony suggesting that her name was identified for termination over a week before the selection committee met to determine which positions should be eliminated.

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 846. "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment… and show more than 'some metaphysical doubt as to the material facts.'" *Gorzynski*, 596 F.3d at 101 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctd. v. Hicks*, 113 S. Ct. 2742, 27521 (1993). Unlike Title VII discrimination cases, it is not enough in a Title VII retaliation case for

the plaintiff to establish that discriminatory retaliation was a "motivating factor"; rather, she must show that discriminatory retaliation was a "but-for cause" of the employer's decision. *Univ. of Texas*, 133 S. Ct. at 2533 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m)."); *cf. Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) (stating that, for purposes of a Title VII discrimination case, "the illegitimate reason could be a substantial or motivating factor, or could have made a difference, even though a legitimate reason was *also* part of the employer's motivation.").

Thus, at this stage of her Title VII retaliation case, Ms. Dixon must establish a genuine dispute of material fact regarding whether MDC would have still terminated her position had she not filed discrimination complaints in 2006. *See Univ. of Texas,* 133 S. Ct. at 2525; *Zann Kwan,* 737 F.3d at 846. Ms. Dixon, however, has failed to make any material factual allegations that could permit a jury to conclude that the reduction in force was pretextual as to Ms. Dixon, or that MDC would not have terminated Ms. Dixon's position as part of the reduction in force had she not filed discrimination complaints. According to the undisputed facts of this case, then, Ms. Dixon cannot carry her ultimate burden, and summary judgment is appropriate.

Ms. Dixon argues that MDC failed to follow its own methodology when selecting her position for elimination. Specifically, she relies on an alleged contradiction in the deposition testimony of MDC managers and committee members, whereby some individuals insisted that Ms. Dixon's position was not identified for elimination until the second committee meeting at the end of September, and others provided information suggesting that Ms. Dixon had already been "pre-selected" for termination before the committee's first meeting. Pl. Mem. in Opp. at 12-13, ECF No. 68.

Robert Zaik, who served on the committee tasked with identifying positions in connection with the reduction in force, testified that Ms. Ryan mentioned the potential elimination of Ms. Dixon's position during the committee's first meeting in mid-September and again mentioned Ms. Dixon's position for elimination during the committee's second meeting at the end of September.  Zaik Dep. at 90-91, 94, Pl. Ex. 23, ECF No. 69-23 ("Q. And Ms. Ryan identified one diversity position [during the first meeting]? A. Sharon – I think Sharon Dixon… Q. And Sharon Dixon was identified by that second meeting? … A. Yes. Her position, yes."). George Scurlock, however, Ms. Plaintiff's supervisor in the Diversity Department, testified that MDC Counsel Bart Halloran had informed him that Ms. Dixon's position would be terminated as early as Labor Day weekend in early September, before the committee's first meeting.  Scurlock Dep. at 81:15 – 82:25, Pl. Ex. 21, ECF No. 69-21 ("Q. Were you told in advance that individuals from your Department would potentially be selected for layoff? A. Yes. Q. Who told you that? A. Attorney Halloran…. Q. So that would have been somewhere around mid September? A. I think I previously testified it was close to Labor Day, early September.  Q. Oh, early September? A. Yes."); *but see* Halloran Dep. at 130:11-19, Pl. Ex. 8, ECF No. 69-8 ("Q. Now, Mr. Scurlock testified that in early September that you advised him that Mr. Gomez and Ms. Dixon would be leaving their positions, do you recall that?  A. What time?  Q. In early September of 2011. So after the decision came down from the Court.  A. I don't remember that. I can't put a date on it.").

Ms. Dixon seeks to treat Mr. Scurlock's testimony as evidence that MDC selected her for termination before the committee had evaluated the necessity of her position in the context of the reduction in force, suggesting that her prior complaints, not the legitimate considerations identified within the selection methodology, caused her selection for termination.  It is

undisputed, however, that this alleged "pre-selection" took place after the Mid-Conn Contract had expired, after MDC knew it would need to implement significant cost savings, and when the committee began identifying specific positions for elimination. Any discussions between Attorney Halloran and Ms. Dixon's supervisor regarding Ms. Dixon's potential termination occurred within the context of the reduction in force and are not material to the question of whether her selection was caused by her prior complaints.

This Court addressed similar "pre-selection" arguments in the context of the same reduction in force in *Gomez*, 10 F. Supp. 3d 224, as well as in *Szestakow v. Metropolitan Dist. Comm'n*, Case No. 3:10-cv-00567 (WWE), 2016 WL 4639129 (D. Conn. Sept. 6, 2016). In *Gomez*, together with other evidence of retaliation in the record, the Court (Arterton, J.) considered an e-mail from July 2011 listing Mr. Gomez's name alongside several other individuals who were ultimately selected for termination, suggesting that Mr. Gomez was selected for elimination "months earlier than Defendant acknowledged[.]" *Gomez*, 10 F. Supp. 3d at 239. The Court found that this evidence alone was insufficient to survive summary judgment, but that together with other inconsistencies it was relevant evidence of pretext: "Drawing all favorable inferences for Plaintiff and assuming that specific individuals were discussed during meetings and preselected for termination, as Plaintiff acknowledges, this showing alone is not sufficient to defeat summary judgment… Nevertheless, evidence of preselection would undermine Defendant's assertion that Gomez's termination was the result of a completely objective process that did not take into account his prior protected activity." *Id.*

Here, unlike Mr. Gomez, Ms. Dixon has failed to identify significant inconsistencies between the selection process described by MDC and the process alleged by Ms. Dixon. Ms. Dixon does not claim to have been identified for elimination months or even weeks before the

formal selection process began; rather, she claims that her name was mentioned to her supervisor as a potential layoff in September 2011, weeks after MDC management had already begun internally discussing the potential need for a reduction in force and within weeks of her actual termination. *See* Zinzarella Dep. (*Drake v. Metropolitan Dist. Com'n*), 95:9-25, Pl. Ex. 6, ECF No. 69-6 ("There was no meeting to select employees prior to September... There was a meeting to discuss the potential of a reduction in force... it was not a formal meeting. It was a discussion between myself and the CEO. Q. And do you recall what month that took place in? A. My recollection is, it was in the July time frame."). Under *Gomez*, absent additional evidence of pretext, these limited allegations of "pre-selection" are not sufficient to survive summary judgment.

Similarly, in *Szestakow*, the Court (Eginton, J.) considered evidence "that plaintiff may have been 'pre-selected' as a candidate for layoff …." *Szestakow*, 2016 WL 4639129 at *6. This evidence included multiple documents showing Ms. Szestakow's name as a candidate for layoff in advance of the first committee meeting, including the mention of Ms. Szestakow's name in the same July 2011 e-mail considered by the Court in *Gomez*. *Id.*; *Szestakow v. Metropolitan Dist. Comm'n*, Pl. Mem. in Opp. at 22, Docket No. 3:10-cv-00567 (WWE), ECF No. 119. The Court considered this documentary evidence alongside evidence of close temporal proximity – while Ms. Szestakow's underlying discrimination complaints were filed in 2008, her termination was within months of Ms. Szestakow's federal discrimination lawsuit against the company. *Id.* (noting that "defendant's decision to select [the plaintiff] for layoff came just four months after plaintiff served defendant with discovery requests and four weeks after serving a notice of deposition.").

Ms. Dixon, on the other hand, does not claim that she was singled out by name at any point before September, nor does she allege that she was ever identified in any written documentation suggesting that she was a candidate for layoff in advance of her termination. Although she refers to the July 2011 e-mail considered by the Court in *Gomez* and *Szestakow* as evidence of inconsistency in MDC's methodology that is arguably suggestive or pretext, it is undisputed that Ms. Dixon was not identified anywhere in this e-mail. July 2011 E-mail, Pl. Ex. 10, ECF No. 69-10. Furthermore, the Court in *Gomez* made it clear that the evidence of "pre-selection" alone was not enough to defeat summary judgment. Thus, for Ms. Dixon to establish a genuine dispute of material fact as to whether MDC's reduction in force was pretext for retaliation, she would need more evidence in order to do so.

The Court also "is obliged not to consider inadmissible evidence at the summary judgment stage...." *Pacenza v. IBM Corp.,* 363 F.App'x 128, 130 (2d Cir. 2010); *see also Wanamaker v. Town of Westport Bd. of Educ.*, No. 3:11-CV-1791 (MPS) (WIG), 2013 WL 3816592, at *1 (D. Conn. July 22, 2013) (noting that "a court may only consider admissible evidence when ruling on a motion for summary judgment") (citing *Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69, 75 (D. Conn. 2004)). Under Rule 403, even relevant evidence is inadmissible "if its probative value is substantially outweighed by a danger of ... unfair prejudice...." Fed. R. Evid. 403.

In arguing that she was "pre-selected" for layoff before the formal commencement of the reduction in force, Ms. Dixon relies primarily on deposition testimony and documentation from other lawsuits brought by Ms. Dixon's former co-workers. *See Gomez v. MDC* Deps., Pl. Exs. 3, 16-17, 19, 44; *Szestakow v. MDC* Deps., Pl. Exs. 7-9, 11-12, 15, 22, 56, 60-61; *see also Anderson v. MDC* Dep., Pl. Ex. 5; *Drake v. MDC* Deps., Pl. Exs. 6, 20-21, 23; *Smith v. MDC*

Deps., Pl. Exs. 28, 35-36, 41, 47-48. Most of the exhibits submitted in opposition to MDC's motion for summary judgment resulted from discovery in those separate legal actions and relate specifically to those plaintiffs, not to Ms. Dixon. *Id.* Significantly, the employees Ms. Dixon refers to most frequently, Mr. Gomez and Ms. Szestakow, are not similarly situated to Ms. Dixon, as they filed discrimination complaints or lawsuits within months of their termination and, unlike Ms. Dixon, they were referenced by name as potential layoff candidates as early as July 2011.

"Depending on the facts and circumstances, testimony or stipulations from other cases may be admissible." *Wasilewski v. Abel Womack, Inc.*, No. 3:10-CV-1857 (VAB), 2016 WL 183471, at *1 (D. Conn. Jan. 14, 2016). However, evidence from other litigations can often carry the risk of being unduly prejudicial, thus may be properly excluded at trial. *See Park West Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 330 (S.D.N.Y. 2009) (finding that "any probative value of the evidence of the Other Litigations is substantially outweighed by the risk of unfair prejudice to [defendant] under FRE 403"); *L-3 Communications Corp. v. OSI Systems, Inc.*, No. 02 Civ. 9144 (PAC), 2006 WL 988143, at *10 (S.D.N.Y. Apr. 13, 2006) (noting that, "[a]lthough evidence related to [prior litigation] may be relevant it runs the risk of being highly prejudicial"); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (noting that "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases").

Most of the evidence on which Ms. Dixon seeks to rely in support of her "pre-selection" argument relates primarily to MDC's treatment of other employees who are not similarly situated and therefore, its probative value is substantially outweighed by its unduly prejudicial nature. *See Ragin v. Newburgh Enlarged City Sch. Dist.*, No. 10 CIV. 2797 (JFK), 2011 WL 2183175, at

*2 (S.D.N.Y. June 3, 2011) (excluding prior litigation from evidence in employment case under Rule 403, noting that "[e]ven if the Court were to accept that these are valid arguments for the admission of evidence of [plaintiff]'s prior litigation, Rule 403 requires exclusion of the evidence of prior litigation because there is too high a risk of juror prejudice and confusion"); *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008) (affirming district court's discretionary exclusion under Rule 403 of testimony from other employees who were not similarly situated to plaintiff). Thus, even if material to this dispute – which, as the Court has indicated earlier, it is not – this evidence would not be admissible at trial and therefore, it cannot be used to defeat summary judgment in this case.

In addition to the arguments outlined earlier regarding the termination of other individuals who filed discrimination complaints against MDC, Ms. Dixon seeks to meet her burden by identifying a series of other alleged inconsistencies on the part of MDC, "such as (1) who were the members of the Layoff Committee; (2) did Mr. Sheehan instruct the committee to conduct a workforce reduction or simply to 'find savings'; and (3) who had input into the layoff decisions, notably the decision to lay off Plaintiff." Pl. Mem. in Opp. at 30, ECF No. 68. The inconsistencies alleged in this case, however, are simply not material to the question of whether MDC's actions here were pretextual. A reasonable jury could not infer from any of these allegations that Ms. Dixon would not have been terminated but for her filing a discrimination complaint five years earlier. *Gallo*, 22 F.3d at 1224.

Finally, Ms. Dixon offers the hiring of Lillian Ruiz following Ms. Dixon's termination as evidence that MDC's decision to include Ms. Dixon's position in the reduction in force was pretextual. L.R. 56(a)(2) at 48-49, ECF No. 69 ("In direct contradiction to the District's proffered reasoning for the layoffs as needing to reduce expenses by $2.1 million, prior to the

Plaintiff's layoff, Mr. Halloran informed Mr. Scurlock that they had hired a consultant, Lillian Ruiz, to perform some of the Plaintiff's tasks."). Ms. Dixon's conclusory allegations on this point, however, cannot be supported in the record, which establishes that Ms. Ruiz was hired to perform job duties previously performed by Mr. Gomez, not job duties previously performed by Ms. Dixon. *See, e.g.* Halloran Dep. at 93:12-14, Def. Reply Br. Ex. F, ECF No. 75-6 ("[W]hat Lillian Ruiz was doing was what Mr. Gomez was supposed to be doing, not what Ms. Dixon was supposed to be doing."). Ms. Dixon has not made any factual allegations that raise a material fact as to whether she would have been terminated had she not filed a discrimination complaint five years earlier. Thus, the Court will not deny summary judgment on this basis.

The Court acknowledges that "where, as here, the plaintiff claims not that her employer used poor business judgment in discharging her but that her employer used the structural reorganization as a cover for discriminatory action, a federal court, to ensure that the business decision was not discriminatory, is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith." *Montana v. First Federal Sav. And Loan Ass'n of Rochester*, 869 F.2d 100 (2d Cir. 1989). Ms. Dixon's allegations, however, are insufficient to present a genuine dispute of material fact as to whether MDC's decision to eliminate her position was made in good faith. Accordingly, MDC's motion for summary judgment is granted as to Ms. Dixon's termination in October 2011.

### B. Verbal Reprimands

In addition to her termination, Ms. Dixon claims that the two verbal reprimands she received in June and July of 2011 constitute discrete acts of retaliation in violation of Title VII. Pl. Mem. in Opp. at 23 n.5, ECF No. 68. Ms. Dixon, however, has not raised a genuine dispute of material

fact that MDC's actions were either materially adverse or caused by her participation in protected activity as required for purposes of a *prima facie* retaliation case.

In order to state a *prima facie* case of retaliation, an employee must have suffered a "materially adverse employment action." *Rivera*, 743 F.3d at 24–25 (internal quotations and marks omitted). "Petty slights or minor annoyances... do not constitute actionable retaliation... the antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotations and marks omitted); *see also Leifer v. New York State Div. of Parole*, 391 Fed. Appx. 32, 35 (affirming summary judgment on retaliation claim where "the reprimand did not result in a 'materially adverse' employment action that would 'dissuade[] a reasonable worker from making ... a charge of discrimination.'") (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Here, Ms. Dixon admits that no formal discipline resulted from her meeting with Mr. Scurlock in June 2011. She even acknowledges that the conversation did not rise to the level of a "verbal reprimand." Dixon Aff. ¶ 31, Pl. Opp. Ex. 1, ECF No. 69-1. Similarly, it is undisputed that the criticism she received from Attorney Stone in July 2011 did not result in any formal discipline. *Id.* at ¶ 34.

Ms. Dixon argues that she has established material adversity because some of her job responsibilities were reassigned following her conversation with Attorney Stone in July 2011. *Id.* ("Soon after this verbal reprimand, I was removed from performing this particular task [the task of monitoring information and forwarding to attorneys] and it was given to another employee...."). An employee's "assignment to new and substantially less desirable duties" may be considered an "adverse employment action" in certain circumstances. *Burlington Northern*,

548 U.S. at 79. Ms. Dixon, however, does not allege that the reassignment of job duties here impacted the quality of her work environment in any way, nor does she claim that any of her job responsibilities following this reprimand were less desirable. Thus, she has not alleged "material adversity" for purposes of a *prima facie* case with respect to these two incidents and summary judgment is appropriately granted on this basis.

Furthermore, even if these incidents could be considered materially adverse employment actions, Ms. Dixon has not raised a material dispute suggesting that "there was a causal connection between the protected activity and that adverse action.'" *Rivera*, 743 F.3d at 24–25 (internal quotations and marks omitted). As explained above in connection with Ms. Dixon's claims regarding termination, a time span of four years is too attenuated to support an inference of causation based on temporal proximity for purposes of a *prima facie* retaliation case. Accordingly, MDC is entitled to summary judgment as to the two verbal reprimands Ms. Dixon allegedly received in June and July of 2011.

## IV. CONCLUSION

MDC's [61] Motion for Summary Judgment is **GRANTED**. The Clerk of the Court is directed to enter judgment for Defendant and close this case.

SO ORDERED this 25th day of September, 2017 at Bridgeport, Connecticut.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE